**EASTERN S. S. LINES, Inc. v. UNITED STATES.**

No. 1228.

District Court, D. Massachusetts.
Aug. 14, 1947.

Arthur J. Santry and Putnam, Bell, Dutch & Santry, all of Boston, Mass., for libellant.

William T. McCarthy, U. S. Atty. and Edward O. Gourdin, Asst. U. S. Atty., both of Boston, Mass., for respondent.

HEALEY, District Judge.

The Eastern Steamship Lines, Inc., brings this libel in admiralty to recover from the United States of America just compensation for the S.S. "George Washington", which was declared a constructive total loss by the United States on October 30, 1944, after it was damaged in a collision with another vessel on September 10, 1944.

The United States, as charterer, and the Eastern Steamship Lines, Inc., as owner entered into a bareboat charter of the S.S. "George Washington" on March 11, 1942. Under the terms of the charter, the United States assumed all maritime and war risks, and agreed that in case of a total loss, it would be obligated to pay to the libelant "just compensation to be determined in accordance with Section 902 of the Merchant Marine Act, 1936, as amended", 46 U.S.C.A. § 1242. Also, by the terms of said charter, any serious casualty suffered by the vessel could be declared a "constructive total loss" at the option of the United States, in which event the United States would be obligated to reimburse the libelant in the same amounts and in the same manner as it would in the case of an actual total loss.

On demand made upon the United States by the libelant for a determination of the amount of just compensation in accordance with Section 902 of the Merchant Marine Act, 1936, as amended, and for a tender of the amount so determined, the United States on September 28, 1945, offered to the libelant the sum of $667,500 as just compensation for the vessel. The libelant re-jected the offer and has brought this action.

The sole question to be determined here is the amount of money that will be just compensation for the loss of the S.S. "George Washington" on October 30, 1944.

Just compensation means the full and perfect equivalent in money of the vessel that was lost. The owner is to be put in as good position pecuniarily as he would have occupied if his property had not been lost. United States v. Miller, 317 U.S. 369, 373, 63 S.Ct. 276, 87 L.Ed. 336, 147 A. L.R. 55. The owner is entitled to the fair market value of its vessel, i. e., the amount that a willing buyer would pay to a willing seller on the date of the loss. However, when for any reason, there is no market, then the owner is entitled to the fair value of the vessel as determined by all the available circumstances and relevant facts, giving each its proper weight and bearing. The Petar, D.C., 68 F.Supp. 296.

Or as was stated by Mr. Justice Butler in Standard Oil Co. of New Jersey v. Southern Pacific Co. and James C. Davis, Director General of Railroads, 268 U.S. 146, 155, 156, 45 S.Ct. 465, 467, 69 L.Ed. 890.

"In case of total loss of a vessel, the measure of damages is its market value, if it has a market value, at the time of destruction. The Baltimore, 8 Wall. 377, 385, 19 L.Ed. 463. Where there is no market value, such as is established by contemporaneous sales of like property in the way of ordinary business, as in the case of merchandise bought and sold in the market, other evidence is resorted to.

"The value of the vessel lost properly may be taken to be the sum which, considering all the circumstances, probably could have been obtained for her on the date of the collision; that is, the sum that in all probability would result from fair negotiations between an owner willing to sell and a purchaser desiring to buy. Brooks-Scanlon Corporation v. United States, 265 U.S. 106, 123, 44 S.Ct. 471, 68 L.Ed. 934. And by numerous decisions of this court it is firmly established that the cost of reproduction as of the date of valuation constitutes evidence properly to be considered in the ascertainment of value. [citing cases]. It is to be borne in mind that value is the

thing to be found, and that neither cost of reproduction new, nor that less depreciation, is the measure or sole guide. The ascertainment of value is not controlled by artificial rules. It is not a matter of formulas, but there must be a reasonable judgment having its basis in a proper consideration of all relevant facts. Minnesota Rate Cases, 230 U.S. 352, 434, 33 S.Ct. 729, 57 L.Ed. 1511, 48 L.R.A.,N.S., 1151, Ann.Cas. 1916A, 18."

■ It, therefore, appears that in determining the fair value of the S.S. "George Washington", no one factor, but several, must be considered, and that the fair value of the vessel must be determined in the light of all the material facts and circumstances, one of which is reproduction cost, new, depreciated to the time of the loss.

Other factors which must be taken into consideration are the value placed on a vessel for insurance, the earning capacity of the ship, its possible future uses, and the manner in which the ship has been maintained. However, each of these factors must be subjected to the test of relevancy, competency and weight. The Petar, supra.

■ The facts to be found from the evidence are as follows:

The S.S. "George Washington" was a combination passenger and cargo steel merchant vessel, built in 1924 at Newport News, Virginia. She was 375 feet 5 inches in length, 54 feet 2 inches in breadth, 29 feet 9 inches in depth, of 5,184 gross and 3,167 net registered tonnage. She had a speed of 16 knots normal, 17 knots maximum, fully laden under good weather conditions. She had a passenger carrying capacity of 320 first class and 35 second class, and crew accommodations for 125. Her dead weight capacity for cargo, fresh water and stores was 2,475 tons (of 2,240 lbs) and her bulk cargo capacity was 244,000 (bale) cubic feet, of which approximately 10,000 cubic feet was refrigerated space for commercial cargo, with a temperature range from 15° to 35°. Her motive power consisted of a 2 cylinder steam turbine—Newport News—Curtis type—with 4 Babcock and Wilcox watertube boilers fired by oil.

Her original cost of construction was $1,617,183.81 in 1924, and the cost of betterments, installed at later dates was $157,184.66. At all times, she was solely owned by the libelant and was engaged solely as a merchant vessel. She was always, to the time of her charter to the United States, maintained in excellent condition by the libelant, and up to the time of her loss, was classed A-1 by the American Bureau of Shipping and the Coast Guard. Although, before her charter in 1941, she was always used in the coastwise trade, she held an "oceans" certificate at all times. During 1940 and 1941, her marine insurance value was $1,250,000. Her probable useful economic life would be 35 to 40 years. From 1924 through 1927, the "George Washington" was operated as a passenger and cargo vessel during the winter between New York and Miami, Florida, under charter to the Clyde Steamship Company, and during the summers between New York and Norfolk, Virginia in the libelant's service. From 1928 to January 27, 1941, she was operated during the winters by the libelant in its passenger and freight service between Boston and New York, and during the summers, between New York and Norfolk.

It is apparent from the evidence that while the libelant realized net profits during 1940 and 1941 from the above services of the vessel, the immediate outlook for that service was not too bright, due to a variety of factors, including increased competition from shore transportation facilities, the high cost of wharfage and of labor.

In February 1942, the "George Washington" went under charter to the Alcoa Steamship Company for service between New York, Bermuda, the Leeward Islands, the Windward Islands, the Virgin Islands and Venezuela. In this service she was used in carrying men and supplies to the Caribbean area for use in the construction of United States military establishments in that area.

On March 11, 1942, the vessel went under bareboat charter to the United States War Shipping Administration for one year at the rate of $925 for each day of 24 hours service. Under this charter, she was oper-

ated by the Alcoa Steamship Company, as agent for the War Shipping Administration out of New York and ports in the Gulf of Mexico into Caribbean ports and ports on the northern coast of South America. While in this service, she suffered the damage which resulted in her being declared a constructive total loss by the United States.

While the libelant cites the use of the vessel in the West Indies as proof of her adaptability for the peacetime passenger and freight trade in that area, should the coastwise trade decline, it appears that serious alterations in her structure as it was in 1944 would be necessary to adapt her for that peacetime trade.

In considering the past uses of the vessel for the purposes of determining her highest possible future use, 2 very important factors must be given their proper weight. The first is the fact that during the war the shortage of shipping facilities made it necessary for the government to make use of a vessel under circumstances which would not make operation of that vessel feasible or economically sound in peacetime. The second is that in the period following the war, there necessarily would be a lack of bottoms and that for a few years, at least, a vessel of the type of the "George Washington", could in all probability find uses that in more ordinary times would be foreclosed to her.

Giving their proper weight to the above-mentioned facts and circumstances according to their relevancy and materiality, we next consider the question of the value of the "George Washington" on October 30, 1944, as determined on the basis of reproduction cost, new, depreciated to that date.

On the question of reproduction cost, new, the libelant produced two witnesses who qualified as experts and testified as to their opinion of the reproduction cost in 1944. One of these witnesses was Lloyd R. Sorenson, Cost Engineer of the Newport News Shipbuilding Company, which had built the "George Washington". He began by taking from the shipyard's books the 1924 cost of construction of the vessel, broken down into totals for each of three catagories: labor, materials and overhead. The 1924 cost of labor he increased by

140%. The 1924 cost of materials, he increased by 50%. He figured the 1944 cost of overhead as 69% of the 1944 cost of labor. Labor, materials and overhead totaled $3,300,000 in his figure for 1944 construction. To this figure, he added 10% as a profit item for the shipyard, thus arriving at a total cost figure of $3,630,000.

James Donald, libelant's other witness, on reproduction cost, new, a naval architect who was engaged in various capacities by various shipbuilding and shipping concerns and has appraised vessels for both the War Shipping Administration and private companies, stated that in his opinion, the reconstruction cost, new, of the "George Washington" in 1944 would have been $3,-650,000.

William O. Schrader, assistant director of the cost section of the United States Maritime Commission for the past 8 years, testified on reproduction cost, new, for the government. His opinion is that the "George Washington's" reproduction cost, new, would be $3,000,000.

George W. Sturm, Chief Appraiser for the United States Maritime Commission for the past five and one-half years, testified for the government that, in his opinion, the reproduction cost, new, of the "George Washington" would be $3,150,000 on a single ship basis. He arrived at this figure by breaking down the cost of the ship into three catagories—steel, outfittings and machinery—plus 19% of that total for the cost of design and fixed charges.

Thomas Barrie, a ship surveyor and appraiser, stated as his opinion that the fair value of the "George Washington" in October 1944 was $1,876,000. He arrived at the figure by taking the cost of reproduction, new, arrived at by Sorenson, and applying a 3½% per annum progressive depreciation for each year of the vessel's life to that figure.

James Donald depreciated his figure for reproduction cost, new, in 1944, at the rate of 2½% on a progressive annual depreciation scale and arrived at a figure which he considered the fair value of the vessel in October 1944—$2,150,000.

Sturm applied a progressive depreciation rate of 7½% per annum to his reconstruc-

tion cost, new, of $3,150,000, and arrived at a fair value in October 1944 of $660,000.

Neither Sorenson nor Schrader gave any opinion as to the value of the "George Washington" depreciated to October 1944.

A Mr. Wade Hampton Rutland, a ship broker, surveyor and vessel appraiser of long experience, stated as his opinion that the "George Washington's" value as of October 1944 was $665,000. He arrived at that figure by depreciating the original cost of the ship ($1,617,000) for 15 years at the rate of $3\frac{1}{3}\%$ per annum on a straight line depreciation basis, and for the last 4 years and 10 months, at the rate of 5% per annum on a straight line depreciation basis on the value at the end of 15 years. He also allowed $50,000 for the depreciated cost of betterments made to the ship over the years.

It is evident from the variance in the above mentioned estimates that reproduction cost, new, depreciated for the life of a vessel, depends for its accuracy, as a measure of value, upon various factors—particularly reproduction cost, new, and the rate of depreciation used. Since each of these factors depends in turn upon an expert's determination of the importance of various subsidiary facts, there is necessarily a great latitude covered by their final figures.

In my opinion, after consideration of the testimony of the various experts as to the manner of determining reproduction cost, new, and the various conditions and facts to be taken into consideration, the reproduction cost, new, of $3,150,000 set forth by Sturm is the one that most nearly corresponds to the circumstances here present.

I am also of the opinion that 5% per annum progressive depreciation is a fair rate for the period of 20 years, the age of the vessel in October 1944.

Using the above figure of $3,150,000 for reproduction cost, new, and the rate of 5% per annum for progressive depreciation, I find the value of the vessel in October 1944 would be $1,129,230.66 on the basis of reproduction cost, new, depreciated progressively at the rate of 5% per annum.

With due consideration of this figure and the various elements upon which its determination was based, and with due regard to other factors, previously mentioned, making adjustments for each according to its relevance, competency and materiality, I find that the fair value of the "George Washington" on October 30, 1944 was $1,100,000. The parties will prepare a decree in accordance with this memorandum and submit it to the court for approval.