**UNITED STATES v. EASTERN S. S. LINES, Inc.**

No. 4366.

United States Court of Appeals
First Circuit.

Dec. 31, 1948.

Jess H. Rosenberg, Atty., Dept. of Justice, of Washington, D. C. (H. G. Morison, Asst. Atty. Gen., William T. McCarthy, U. S. Atty., of Boston, Mass., J. Frank Staley, Sp. Asst. to Atty. Gen., of Washington, D. C. and Edward O. Gourdin, Asst. U. S. Atty., of Boston, Mass., on the brief), for appellant.

Arthur J. Santry and Richard Bancroft, both of Boston, Mass. (Putnam, Bell, Dutch & Santry, of Boston, Mass., on the brief), for appellee.

Before MAGRUDER, Chief Judge, WOODBURY, Circuit Judge, and PETERS, District Judge.

WOODBURY, Circuit Judge.

This is an appeal by the United States from a final decree entered in a libel brought under the Suits in Admiralty Act of March 9, 1920, 41 Stat. 525, 46 U.S.C.A. §§ 741–752, awarding the libellant, Eastern Steamship Lines, Inc., $1,100,000 as "just compensation" as of October 30, 1944, for the Steamship George Washington with interest on the amount awarded at 4 percent calculated from the date the libel was brought.

The steamship in question was a combined cargo and passenger vessel 375 feet and 5 inches in length, 54 feet and 2 inches in breadth and 29 feet and 9 inches deep. She was built in 1924, and had been used exclusively by her owners from that time until early in 1942 in the United States Atlantic Coast trade, although at all times she was certified by federal steamship inspection authorities as fit for use in any ocean. She had capacity for 320 first class and 35 second class passengers, plus a crew of 125, and capacity for about 2,475 long tons of cargo, fresh water and stores. Her normal speed was 16 knots and she apparently was capable of crossing the Atlantic but it does not appear that she ever did so. Her original cost was $1,617,183.81 and the libellant had spent amounts variously estimated at from approximately $125,000 to $160,000 on her in "betterments". At all times the vessel had been maintained in excellent condition.

In February 1942, at the Government's request, the libellant chartered the George Washington on the bare boat basis to Alcoa Steamship Company, and that company used her for the carriage of passengers and cargo between United States Atlantic coast ports and ports in the Caribbean Islands. Then, as of June 2, 1942, the libellant chartered the vessel, also on the bare boat basis, directly to the United States acting through the War Shipping Administration for employment in the same trade. Thereafter Alcoa Steamship Company continued to operate the vessel as the agent of the United States.

Under the terms of this charter the United States assumed all marine and war risks and agreed in the event of the total loss of the vessel that it would pay the libellant "just compensation to be determined in accordance with Section 902 of the Merchant Marine Act, 1936, as amended [46 U.S.C.A. § 1242]." The United States also agreed that in the event the vessel was seriously damaged it would "have the option of declaring the Vessel a constructive total loss by so notifying the Owner" in which event it would "forthwith reimburse the Owner in the amounts and in the manner indicated * * * in the case of actual total loss."

The George Washington was in collision with another vessel on September 10, 1944, and subsequently the United States exercised its option by notifying the libellant that it had declared the vessel a total loss as of October 30, 1944. Approximately a year later the War Shipping Administrator determined that the sum of $667,500 constituted just compensation for the vessel and tendered that sum to the libellant. Believing this amount inadequate, the libellant rejected the tender and on April 8, 1946, filed the instant libel against the United States.

Both parties agree that the term "just compensation" in the charter means fair market value—what a willing seller would take and a willing buyer would give in a free and open market for the ship at the time of its constructive total loss—and both parties also agree that at the time of the constructive total loss of the George Wash-

ington, October 30, 1944, there was no free and open market for merchant vessels and had been no such market for them for almost two and a half years due to the wartime conditions then prevailing. The principal issue between the parties is as to the method to be used in arriving at the "fair market value" of the vessel under the abnormal economic conditions prevailing at the time of its constructive total loss.

At the trial the libellant offered the testimony of two expert witnesses as to the cost of reproducing the George Washington at the time of its loss and as to the rate of depreciation which ought to be progressively applied to that cost in order to calculate the fair market value of the vessel on the critical date. The libellee strenuously objected to the introduction of this testimony on the ground that reproduction cost was not a proper basis for determining fair market value, but the court below overruled the objection and admitted the testimony.

The libellant's two expert witnesses then testified to a reproduction cost for the vessel, plus its betterments, as of October 30, 1944, of approximately $3,650,000 and expressed the opinion that to arrive at the fair market value of the vessel on the date of loss her reproduction cost ought to be depreciated progressively over the vessel's elapsed life of 20 years at, respectively, 2½ and 3½ per centum per annum. The libellee, in its turn, but saving its objection to the admission of any testimony of reproduction costs, put on two witnesses who said that it would cost in the neighborhood of $3,000,000 to construct a vessel like the George Washington at the time she was lost, and that to arrive at her fair market value on that date the cost of reproducing her should be progressively depreciated for twenty years at 7½ per centum per annum. The United States also put on an expert witness who gave the opinion that the proper basis for valuing the vessel was not her reproduction cost at all, but was her actual cost in 1924, which was stipulated to have been $1,617,183.81, plus the actual cost of its betterments, found by the court below to be $157,184.66, depreciated on the straight line basis for the first 15 years of the vessel's life at 3⅓ percent and for the next 5 years of her life at 5 percent calculated on the undepreciated balance, which gave a value for the vessel on the date of her loss of approximately $665,000.

The District Court did not adopt the view expressed by this last witness. Under the circumstances it considered reproduction cost of the vessel and its betterments progressively depreciated to be an appropriate basis for determining fair market value, and, taking the estimate of this cost made by one of the Government's witnesses ($3,-150,000), it depreciated that amount progressively for twenty years at the rate of 5 per cent per annum and arrived at $1,129,-230.66 as the value of the vessel on this basis. Then the court said [74 F.Supp. 37, 41]: "With due consideration of this figure and the various elements upon which its determination was based, and with due regard to other factors, previously mentioned, making adjustments for each according to its relevancy, competency and materiality, I find that the fair value of the 'George Washington' on October 30, 1944 was $1,-100,000."

The District Court obviously rested its ultimate finding of value principally, although not exclusively, upon the cost of reproducing the George Washington at the time of her constructive total loss, progressively depreciated for 20 years at 5 per centum per annum. This, the Government contends, constituted error.

█ It does not, nor could it successfully, contend that evidence of the reproduction cost new of a merchant vessel, progressively depreciated over its life span, is, as a general proposition of law, inadmissible at the trial of the issue of the fair market value of such a vessel during war-time when no free and open market for such property exists. Undoubtedly, contemporaneous sales of comparable property on the market afford the best evidence of market value. But when it is impossible to establish such value by reference to reasonably contemporaneous sales of like property made in the course of ordinary business, resort must of necessity be had to other evidence of value, typically either actual or reproduction cost depreciated in some way, in order to determine the amount at which the property would probably change hands

between willing bargainers in a free market, provided there was such a market. And if reproduction cost depreciated is not to be considered in determining value when no market exists, there remains for consideration only original cost depreciated which "may furnish a very inferior criterion whereby to ascertain the value at the moment of destruction" as pointed out by the Supreme Court in the Standard Oil Co. case, infra, 268 U.S. at pages 157 and 158, 45 S.Ct. at page 467, 69 L.Ed. 890. Numerous cases firmly establish the admissibility of evidence of the cost of reproduction of a vessel as of the date of valuation in cases comparable to the one at bar. Standard Oil Co. v. Southern Pacific Co., 268 U.S. 146, 155, 156, 45 S.Ct. 465, 69 L.Ed. 890, and cases cited; Ozanic v. United States (The Petar), 2 Cir., 165 F.2d 738, 741. Furthermore, the District Court did not slavishly follow nor literally apply the test of reproduction cost depreciated. It tempered the result reached by application of that test by consideration of other factors affecting value.

■ The Government's contention is that replacement cost depreciated is a legally erroneous basis for valuing the specific steamer George Washington because, it says, the uncontradicted, and, it asserts, the uncontradictable evidence is that no reasonable person as a commercial proposition would think of replacing her at all, particularly of replacing her at the high costs of construction prevailing late in 1944. It says that the reason for this is that the vessel was clearly not worth replacing in 1944 because increased stevedoring costs, Government regulations, and competition with trucks and other forms of land transportation, made it impossible profitably to operate combination passenger and cargo ships of her type in the trade for which they were designed and in which the vessel in question had always been used, i. e. the United States Atlantic coast trade, and that despite her ocean-going certificate, the George Washington could not profitably be operated in any other trade, with the possible limited exception of a handicapped operation in the Mediterranean, or the New Orleans-Mexico-north coast of South America trade. In short, the Government contends that at the time of her loss the George Washington was obsolete for all practical purposes and hence that evidence of her reproduction cost should have been excluded as without bearing on her market value. We do not agree.

It may be that as to some kinds of property and under some circumstances " 'replacement cost' is a spurious, i. e., non-legal, basis for determining just compensation." Mr. Justice Frankfurter, speaking for himself, the Chief Justice, and Mr. Justice Burton in United States v. John J. Felin & Co., 334 U.S. 624, 640, 68 S.Ct. 1238, 1246. See also United States v. Boston, C. C. & N. Y. Canal Co., 1 Cir., 271 F. 877, 887. And it may be that one of the kinds of property in this category is that which has become wholly obsolete. We incline to think that evidence of reproduction cost should, and probably would, have been rejected by the court below had the George Washington been a wooden square-rigged clipper ship, or even a modern steamer of unconventional design or construction with a history of limited usefulness. See Smith-Douglass Company, Inc., v. United States, Ct.Cl., 81 F.Supp. 215. The trouble with the Government's argument is that the record does not establish that combination passenger and cargo vessels like the one in question were in fact unconventional in design or construction, or as a practical matter obsolete in 1944, or had a history of limited usefulness.

There is evidence in the record that for the factors enumerated the Atlantic coastwise trade had in recent years been less profitable than formerly. But it does not conclusively appear that that trade had become and would probably remain wholly profitless. There is evidence from one of the libellant's expert witnesses that in his opinion, although it would not have been profitable to build ships of the type of the George Washington during the depression years, "That does not apply up until 1944. That applied probably up until about 1939"; that in 1939 "there was a radical change in the shipping business due to the war" with the result that "a reasonably prudent" ship operator "absolutely" and "definitely" would at that time order the "construction of a vessel comparable to the George Washing-

ton in this country;" that had it been possible privately to build ships during the war, and if "shipping companies could operate freely in 1944, there was certainly lots of companies that would have built a vessel of this type;" and that there was "a latent demand for that type of vessel in 1944."

Furthermore the George Washington at the time of its loss was in active use under a charter which it would seem was profitable to its owner.

Of course, no one in 1944 could tell how long the war-time shipping boom would last, or what would be the future of shipping after the war, but in the face of the above testimony we cannot say that the conclusion is required that the George Washington was obsolete at the time of her loss. Under these circumstances we think that the ruling of the court below was fully supported by the Standard Oil Co. and Ozanic cases cited above and that the John J. Felin & Co., and Boston, C. C. & N. Y. Canal Co. cases heavily relied upon by the libellee are not in point.

■ But the libellee contends that, assuming the admissibility of evidence of reproduction cost new less depreciation, the conclusion of the court below that 5 per cent per annum was the proper rate of depreciation for the vessel in question was "entirely arbitrary and without any support in the record", and that a critical analysis of the evidence conclusively establishes that the 7½ percent rate testified to by its expert witness is "the appropriate rate applicable under the circumstances." Again we do not agree.

The 5 percent rate adopted by the District Court is not only within the range of the expert testimony as to the rate which ought to be applied, but it is also, according to the testimony, the rate frequently used and generally recognized in the industry as appropriate in making general average adjustments resulting from marine casualties wherein the ship involved must be valued. And furthermore it appears that the 5 percent rate is the one which has been used by experts, even by the Government's expert who testified to the 7½ percent rate, in making war-time appraisals not only of cargo vessels but also of combination passenger and cargo vessels as well. The rate chosen seems to us, as it seemed to the court below, an entirely appropriate one to use.

Other errors urged upon us by the respondent with respect to the valuation of the vessel by the court below have been considered but seem to us not to require discussion. It will suffice to say that we agree with the conclusion reached by the District Court as to the value of the vessel at the time of her constructive total loss.

The question of interest on the award remains for consideration.

■ As already appears, the court below decreed interest on the amount it awarded at 4 percent calculated from the date the libel was brought. No complaint is made as to the rate of interest, but the libellant-appellee, by assignments of error, contends that interest at the 4 percent rate should have been given on the award from the date the vessel was lost.

Section 3 of the Act authorizing suits against the United States in admiralty, the so called Suits in Admiralty Act of March 9, 1920, 41 Stat. 526, 46 U.S.C.A. § 743, provides that "A decree against the United States * * * may include costs of suit, and when the decree is for a money judgment, interest at the rate of 4 per centum per annum until satisfied, * * *. Interest shall run as ordered by the court." This section of the Act standing alone would clearly seem to clothe district courts with discretionary authority in suits under the Act to award interest at the statutory rate from the date liability arose as well as from the date of suit. And it was so held by the Supreme Court in 1925 in James Shewan & Sons, Inc., v. United States, 267 U.S. 86, 45 S.Ct. 238, 69 L.Ed. 527. But § 5 of the Suits in Admiralty Act was amended in 1932, 47 Stat. 420, 46 U.S.C.A. § 745, both in phraseology and by the addition of several provisos, the final one reading: "And provided further, That no interest shall be allowed on any claim prior to the time when suit on such claim is brought as authorized hereunder."

■ On its face the language of § 3 read in conjunction with the language of § 5 as

**594**

amended, seems so clear as to leave no room to doubt that now courts may not in suits under the Act decree interest against the United States prior to the date of suit. But the libellant contends that the legislative history of the 1932 amendment of § 5 clearly indicates that its only purpose was to give rights of action to suitors whose claims had become barred by the statute of limitations while they vainly attempted to sue the United States under the Act in the Court of Claims, and this, it is contended, warrants the inference that the limitation of the running of interest proviso of the amendment, in spite of the generality of its words, was intended by Congress to apply only to the claims to which relief was extended by § 5. The legislative history of the amendment adverted to does not seem to us persuasive. See National Bulk Carriers, Inc., v. United States, 3 Cir., 169 F.2d 943. Cf. United States v. New York Rayon Importing Co., 329 U.S. 654, 658, 67 S.Ct. 601, 91 L.Ed. 577. See also United States v. Thayer-West Point Hotel Co., 329 U.S. 585, 67 S.Ct. 398, 91 L.Ed. 521. If hardship results from this holding as to the running of interest, relief must be sought in Congress, not in the courts.

The decree of the District Court is affirmed.