**AMERICAN–HAWAIIAN S. S. CO. v. UNITED STATES.**

**THE ALASKAN.**

United States District Court
S. D. New York.

Jan. 21, 1949.

Supplemental Opinion Feb. 15, 1949.

Kirlin, Campbell, Hickox & Keating, New York City (Clement C. Rinehart and Carl H. Watson, Jr., New York City, of counsel), for libelant.

John F. X. McGohey, U. S. Atty., for Southern District of New York, New York City (Edward L. Smith, Sp. Asst. to Atty. Gen., of counsel), for United States.

LEIBELL, District Judge.

Pursuant to the provisions of a requisition time charter and acting under the Merchant Marine Act of 1936, T. 46 U.S. C.A. § 1128, the War Shipping Administration issued a policy of war risk insurance covering the S. S. "Alaskan" under which the United States of America be-

came obligated to pay the owner, American Hawaiian Steamship Company, "just compensation" if the vessel was lost through a risk covered by the policy. The Alaskan was requisitioned May 25, 1942 on a time charter basis and was delivered to the War Shipping Administration, under the charter, on June 12, 1942. The binder for the insurance was dated July 27, 1942. Clause E of the requisition time charter and Endorsement No. 2 on the insurance binder provided that "just compensation" was to be determined in accordance with Section 902 of the Merchant Marine Act of 1936, as amended. T. 46 U.S.C.A. § 1242. The Alaskan was torpedoed and sunk on November 28, 1942. The loss of the Alaskan was "due to operation of a risk assumed by the United States under the terms of a charter" § 1242(c), and it was a risk covered by the War Shipping Administration's standard hull risk insurance policy which included perils from mines and torpedoes. The Merchant Marine Act of 1936, as amended, T. 46 U.S. C.A. § 1128d, provides that actions on claims from losses on account of insurance, "shall proceed and shall be heard and determined according to the provisions of sections 741–752 of this title" Title 46. Those sections constitute the Suits in Admiralty Act.

The War Shipping Administration determined that "just compensation" for the loss of the Alaskan was the sum of $776,-003 and on December 23, 1944 tendered that amount with interest at 7/8 of 1% from January 29, 1943. The tender was rejected by the American Hawaiian Steamship Company. The government later paid the company 75% of that sum under § 1242(d) of T. 46 U.S.C.A., and the company became entitled to sue for a sum which when added to the 75% "will make up such amount as will be just compensation" for the loss.

On November 27, 1944 the American Hawaiian Steamship Company filed a libel in this Court against the United States of America under the Suits in Admiralty Act, T. 46 U.S.C.A. §§ 741–752, claiming that just compensation for the loss of the Alaskan was $1,035,000, together with interest. The total amount paid by the government

on account of the loss was $582,002.25 (75% of $776,003). The suit was authorized under T. 46 U.S.C.A. § 1128d; in the event of disagreement as to a claim for losses on account of insurance issued under §§ 1128–1128d of that title.

On July 9th, 1947 Judge Knox appointed George W. Alger as Commissioner, pursuant to Rule 43 of the Admiralty Rules, 28 U.S.C.A., "to hear the parties and take proof upon all the issues of law and fact presented by the pleadings and to ascertain and compute the amount, if any, owed to the libelant by respondent and to report thereon to this Court".

The Commissioner filed his report on July 14, 1948 in which he determined that just compensation for the Alaskan, as of date of delivery under the time charter on June 12, 1942, the beginning of the risk, was $983,250 ($95.00 per deadweight ton); and that that sum was also her value as of the time of her loss on November 28, 1942. The Commissioner also held that the libelant was entitled to 4% interest on the amount unpaid, the interest to be calculated from November 27, 1944, the date on which the libel was filed. T. 46 U.S.C.A. §§ 743 and 745. Both the libelant and the respondent filed exceptions to the Commissioner's report.

Libelant's exceptions numbered (1) and (2) relate to the amount found by the Commissioner to be "just compensation" for the Alaskan. Other exceptions of libelant refer to various subfindings, such as (3) the market for vessels in 1941; (4) the absence of a market in 1942; (5) the earning power and replacement cost of the Alaskan; (6) the cost of her upkeep; (7) the type of her crew quarters; (8) the bearing of governmental restraints and controls over the transfer, use and earnings of vessels on the issues in this case; (9) the failure of proof of their effect on earning power and value; (10), (11) and (12) the purpose, use, effect and legality of the governmental restraints and controls over vessels. Libelant's exceptions (13) to (15) inclusive, are directed against the Commissioner's rulings as to the rate of interest and the period for which interest is allowable.

The seven exceptions filed by the respondent are based on respondent's contentions that (1) just compensation for the Alaskan should have been fixed at $490,000 instead of $983,250; (2) that the vessel's value should have been fixed as of November 28, 1942, the date of her loss, instead of June 12, 1942, the date when she was requisitioned under the time charter and when the risk under the policy of insurance began; (3) that libelant should not have been allowed any interest, because it had been overpaid; (4) that the Commissioner fixed a unit price per deadweight ton for the Alaskan instead of fixing the Alaskan's value as a whole; (5) that he failed properly to take into account her depreciation in value due to her age; (6) that he failed properly to take into account the depressing effect of governmental restrictions on her use and transfer; and (7) that he improperly deemed the value of the Alaskan to have been enhanced by causes necessitating her taking and improperly awarded an amount including such enhancement.

▆ The $95.00 a deadweight ton when multiplied by the vessel's deadweight capacity of 10,350 tons is "equivalent to" the $983,250 valuation figure fixed by the Commissioner. A similar multiplication of the number of deadweight tons by a certain dollar amount per ton is used as part of a formula for determining a basic valuation under Option I, paragraph E of the requisition time charter (Ex. 15). There is nothing wrong in stating that a vessel has a value of a certain amount per deadweight ton. Appraisers use those terms. Respondent's exception (4) is overruled.

The Commissioner's report discusses what he considered the substantial issues in the case: (A) the amount to be awarded as "just compensation" for the loss of the Alaskan; (B) whether the date of requisition (June 12, 1942) or the date of the vessel's loss (November 28, 1942) should be taken as the date as of which the vessel is to be valued; and (C) the rate of interest on the amount determined to be the value of the vessel and the date from which interest should be calculated.

██ The Commissioner held as to (B) that since this was a suit on an insurance policy the date of requisition (June 12, 1942), at which the risk under the insurance policy began, was the date as of which the Alaskan should be valued, but that as a practical matter it made no difference whether that date or the date the vessel was lost (November 28, 1942) was used, because in his opinion the value of the vessel was the same on both dates. Libelant's claim is based on a loss covered by an insurance policy. In marine insurance "the value of the vessel at the beginning of the risk" is the "amount of interest insured". This rule is supported by the authorities [1] cited in the Commissioner's report and by the language of the policy in suit. Respondent's exception (2) is accordingly overruled.

As to (C), the Commissioner held that under the Suits in Admiralty Act, T. 46 U.S.C.A. § 743, the rate of interest should be 4%, and that under § 745 no interest should be allowed on the claim for the period prior to the time when the suit was commenced. That the 4% interest rate is proper has been decided in the following cases:—The Comus, 2 Cir., 1927, 19 F.2d 774, 777; Smith v. United States Shipping Board Emergency Fleet Corp., 2 Cir., 1928, 26 F.2d 337, 339; National Bulk Carriers v. United States, 3 Cir., 1948, 169 F.2d 943; United States v. Eastern S. S. Lines, 1 Cir., 1948, 171 F.2d 589.

The provision of § 745 of T. 46 U.S. C.A., barring interest on a claim for the period prior to the institution of the suit, was added to § 745 by amendment June 30, 1932. It had been in effect for almost four years when § 1128d, authorizing suits on claims for losses on account of insurance, was enacted June 29, 1936. No matter what may have been the original purpose of the aforementioned provision of § 745 when it was enacted, the Congress took it at its face value when it made that section applicable to suits authorized under § 1128d. The question of the date from which the interest runs has recently been passed upon by the Court of Appeals for the Third Circuit in National Bulk Carriers v. United States, supra, and by the Court of Appeals for the First Circuit in United States v. Eastern S. S. Lines, supra. Both circuits held that interest on the valuation sum runs only from the date of suit. The arguments presented by the libelant in this case in support of its contention that the interest rate should be 6% and should cover a period prior to the filing of the libel were thoroughly considered and answered in the opinion in the National Bulk Carriers case.

In the case at bar the libel was not filed until November 27, 1944, almost two years after the vessel was lost. The provisions of the statute as to interest may seem harsh and not in accord with commercial practice; but a claimant can always preserve his claim for interest by bringing suit promptly. Further, as was observed by the First Circuit in the Eastern S. S. Co. case, [171 F.2d 594] "relief must be sought in Congress, not in the courts."

██ The government's position on the interest question in the case at bar appears to be this: the government agrees with the Commissioner's ruling that provisions of the Suits in Admiralty Act apply, but contends that the libelant herein was overpaid (having been paid $582,002.25 as against

<hr>

[1]. The Commissioner's report states:—
"There seems to be no question but that normally, by applying ordinary rules of insurance law applicable to policies of insurance to which commercial insurance law and practice apply, the date of requisition would be the date used. Moreover, the usual rules applicable to insurance policies are required to be applied, where no contrary provisions of statute intervene, to insurance policies issued by the Government in requisition cases. This is not a matter of inference but is the expressed direction of Congress (46 U.S.C. Section 1128, subsection c) whether they relate to a valued or an open policy. The ordinary rule, if so applicable is that "The amount of interest insured is the value of the vessel at the beginning of the risk." See Arnold, Marine Insurance, 12th Edition, 1939, Sec. 365; Richards, Law of Insurance, 4th Edition, 1932, Sec. 187, n. 80; Phillips, The Law of Insurance, 5th Edition, 1867), Secs. 1222, 1745. Peninsular & Occidental S. S. Co. v. Atlantic Mutual Ins. Co., D.C.Pa.1911, 185 F. 172, affirmed [3 cir.], 194 F. 84."

a value of $490,000, now asserted by the government) and hence no interest should have been allowed by the Commissioner. The basis for the $490,000 valuation will be hereinafter discussed. Since I have concluded that the Commissioner's valuation ($983,250) was correct, the government's contention that no interest should be allowed is rejected. Libelant's exceptions (13), (14) and (15), and respondent's exception (3), which relate to the matter of interest, are overruled.

[5] The exceptions challenging the correctness of the Commissioner's finding as to the value of the Alaskan on June 12, 1942, present, as the questions to be reviewed, "whether all the relevant factors which the law requires to be given effect were duly considered and, if so, whether the evidence adequately supports the finding." Ozanic v. United States (The "Petar"), 2 Cir., 165 F.2d 738, at page 740. As stated by Judge Chase in his opinion in The Petar case, there is no formula of fixed application that can be laid down as a "rule of thumb" in determining the value of a vessel. "Each valuation that is contested will have to be reviewed on the merits of the particular case."

The finding of the Commissioner that the Alaskan had a value of $983,250 as of June 12, 1942 is "entitled to great weight and to be given effect unless there was a clear mistake in arriving at it." The Petar, supra.

Admiralty Rule 43½ provides:—

"In all references to commissioners or assessors, by consent or otherwise, whether the reference be of all issues of law and fact, or only particular issues either of law or fact or both, the report of the commissioners or assessors shall be treated as presumptively correct, but shall be subject to review by the court, and the court may adopt the same, or may modify or reject the same in whole or in part when the court in the exercise of its judgment is fully satisfied that error has been committed: * * *."

At this point it seems proper to consider the basis for the government's present contention that the value of the Alaskan should be fixed at $490,000.

For reasons set forth in Exhibit 40 the Comptroller General, on November 28, 1942, expressed an opinion (at page 124 of the Exhibit) that the enhancement clause in § 902(a), of T. 46 U.S.C.A., prohibits the payment as compensation for a requisitioned vessel of any amount that may be based upon a valuation in excess of the values existing on September 8, 1939, "provided such excess be determined as due to economic conditions directly caused by the national emergency". Starting with a stipulated value of $450,000, for the Alaskan as of September 8, 1939, the respondent works out a value for the Alaskan as of November 28, 1942 "of a little under $490,000, a sum less than the amount paid by the Government on account". September 8, 1939 was the day on which the President, by Proclamation, declared the existence of a limited national emergency. It was not until May 27, 1941 that the President declared the existence of an unlimited national emergency.

The Advisory Board on Just Compensation, composed of Circuit Judges L. Hand, J. J. Parker and J. C. Hutcheson, Jr., was established by Executive Order dated October 15, 1943, No. 9387, to formulate rules for the guidance of the War Shipping Administration in determining the "just compensation" to be paid for requisitioned vessels. At the time the Board was named the Comptroller General and the War Shipping Administration held divergent views on the elements to be weighed in determining the value of a requisitioned vessel. The Commissioner in the case at bar, properly gave due consideration to the Rules formulated by the Advisory Board. The $490,000 figure now advanced by the government would not be just compensation. Indeed, the chief appraiser of the Maritime Commission at the hearing before the Commissioner gave the Alaskan a value of $716,000.

The Commissioner, George W. Alger, in the following quoted paragraph of his report states how he arrived at the conclusion that the value of the Alaskan should be fixed at $983,250—

"In reaching a conclusion as to what price would result from negotiations between an owner willing to sell and a purchaser willing to buy the Alaskan in 1942 when it was requisitioned and sunk, I have taken into consideration all relevant evidence and sought to reach a conclusion which is a reasonable judgment based thereon. I first considered that the sale in 1941 of comparable vessels afforded a fair and proper market basis for considering such value of the Alaskan giving due regard to certain advantages of the Alaskan over these vessels of almost similar age and in connection therewith I gave due regard to the testimony concerning the effect of Government restrictions made partly effective in the fall of 1941 and supplemented by further regulations and restrictions in 1942. I also considered not only the facts concerning the sales of specific ships in the market of 1941 but testimony on general ship sales values in that year to the extent that they indicated a rising market during that year. I then checked my conclusion, tentatively reached thereon, with the facts in the record concerning the character and appointments of the vessel itself, its age, cost, improvements, its earnings and physical condition both before and after requisition, and the testimony of experts on its reproduction cost less depreciation, and all other factors relating to value not specifically enumerated above which are contained in the record. Using these as a basis for checking my previous conclusion I reached a result consistent with and a confirmation of the conclusion reached by the first process specified above. Giving due weight to all the proof submitted before me my conclusion is that the value of the Alaskan should be fixed at $95.00 per deadweight ton, or the sum of $983,250."

The Commissioner's report discusses the evidence on many of the elements he considered, and his reasoning in relation to each. A careful reading of the report, which analyzes the testimony of the experts, discloses the Commissioner's "thought processes".

Libelant's exceptions (6) and (7) relate to comparatively minor matters. What the Commissioner stated in reference thereto was general in its nature and of no real importance.[2] It certainly would not justify a rejection of the report. Libelant's exceptions (6) and (7) are overruled.

In his main brief libelant's counsel states that his exceptions (8) through (12) are directed to the Commissioner's holding that this court is "no forum in which to decide the legality of the regulations adopted by our government" and to the Commissioner's failure to disregard the effect of the "controls" in determining just compensation, or, alternatively, to his failure to find as a matter of fact, that the "controls" did not depress the earning power and value of the Alaskan as claimed by the respondent. On the other hand the brief of the respondent's counsel argues that "The Commissioner, despite his ruling that governmental controls must be taken into account, erroneously valued the Alaskan on the basis of a rising market that had gone out of existence long before any date material to this proceeding by reason of governmental controls, restraints and burdens which completely reversed the trend of vessel values and, in fact, ignored the effects of controls over shipping". This is an amplification of respondent's exception (6).

The governmental regulations and controls affecting the sale, chartering, use and operation of vessels, were given proper consideration by the Commissioner in fixing the value of the Alaskan.

On September 8, 1939 the President by a formal Proclamation, No. 2352, 54 Stat. 2643, 22 C.F.R. p. 59, 143.1 (1939 Supp.), declared the existence of a limited national emergency caused by the existence of a state of war between certain nations, which imposed "on the United States certain duties with respect to the proper observance,

---

2. Admiral Land's deposition supports the Commissioner's finding as to the Alaskan's crew quarters. She was 24 years old, and her upkeep might well be higher than a more modern vessel.

safeguarding, and enforcement of such neutrality, and the strengthening of the national defense within the limits of peacetime authorization". The proclamation contained a "Whereas" clause that "measures required at this time call for the exercise of only a limited number of powers granted in a national emergency * * *."

On May 27, 1941 the President issued a further Proclamation, No. 2487, 50 U.S.C.A.Appendix, note preceding § 1, p. 78, 22 C.F.R. 143, 35 C.F.R. 3, 46 C.F.R. 48, declaring the existence of an unlimited national emergency, in order to "mobilize and have ready for instant defensive use all of the physical powers, all of the moral strength and all of the material resources of this nation."

The proclamations activated certain executive orders, administrative regulations and statutory powers that had been held in reserve, and also formed the basis for subsequent Acts of Congress which were designed to facilitate the purposes of the proclamations by subjecting practically all industries to regulation in respect to allocations of materials, priorities thereto, the export and import of vital materials, and the prices of commodities and manufactured products. All of this radically affected the commercial life of the United States and limited profits in the interest of national security.

The Shipping Act of 1916 was one of the statutes made operative by the issuance of the President's emergency proclamations. It provided, T. 46 U.S.C.A. § 808, that:—

" * * * it shall be unlawful, without the approval of the United States Maritime Commission, to sell, mortgage, lease, charter, deliver, or in any manner transfer, or agree to sell, mortgage, lease, charter, deliver, or in any manner transfer, to any person not a citizen of the United States, or transfer or place under foreign registry or flag, any vessel or any interest therein owned in whole or in part by a citizen of the United States and documented under the laws of the United States, or the last documentation of which was under the laws of the United States."

Section 835 of Title 46, U.S.C.A., which also became operative by virtue of the Presidential Proclamation, provided that:—

"When the United States is at war or during any national emergency, the existence of which is declared by proclamation of the President, it shall be unlawful, without first obtaining the approval of the commission:" to transfer, sell, mortgage, lease, charter, deliver, or place under foreign registry any vessel owned by a citizen of the United States or to construct for or for the benefit of a foreigner any vessel in the United States.

One of the most important Acts designed to regulate and control the use and charter rates of vessels was the Ship Warrants Act of July 14, 1941, T. 50 U.S.C.A.Appendix, § 1281 et seq. The statute was enacted as part of the emergency and war shipping legislation. It provided:—

"§ 1281. Priorities in transportation by merchant vessels during National Emergency; issuance of warrants

"During the emergency declared by the President * * * the President may, notwithstanding any other provisions of law, * * * authorize the United States Maritime Commission to issue warrants as hereinafter provided * * *."

"§ 1282. Form and content of warrants; supervision of vessel by owner or charterer; effect on coastwise laws

"The warrants to be issued pursuant to this Act shall be in such form as the Maritime Commission shall prescribe, and shall set forth the conditions to be complied with * * * by reference to an undertaking of the owner or charterer with respect to the trades in which such vessel shall be employed, the voyages which it shall undertake, the class or classes of cargo or passengers to be carried, the fair and reasonable maximum rate of charter-hire or equivalent, * * *."

The priorities are described in § 1283 of T. 50, U.S.C.A.Appendix, as follows:—

"Vessels holding warrants issued pursuant to this Act shall be entitled to priority over merchant vessels not holding such warrants, with respect to the use of facilities for loading, discharging, lighterage or

storage of cargoes, the procurement of bunker fuel or coal, and the towing, overhauling, drydocking or repairs of such vessels."

On July 30, 1941, about two weeks after the enactment of the Ship Warrants Act, the United States Maritime Commission announced in Press Release No. 970a—

"new scale of maximum time charter rates for United States and foreign flag vessels, effective August 1, materially reducing existing rates."

The Commission stated that the new scale was established

"coincident with the request by President Roosevelt for enactment by Congress of legislation establishing a ceiling on prices and rents * * * in keeping with its longstanding policy of maintaining steamship charter and cargo rates at as reasonable a level as possible, in order to prevent inflationary influence on commodity prices."

Thereafter the United States Maritime Commission adopted Ship Warrant Regulations, 46 C.F.R. 241 (1941 Supplement) which were approved by the President, August 26, 1941, 6 F.R. 4537. These regulations provided in Sec. 241.42 (§ 4.02) thereof, a form of application for a warrant wherein the applicant agreed to conform to certain restrictions with respect to routes, passengers and cargoes, the amount of charter hire and schedules of information. After filing an undertaking and an application for a warrant, a ship warrant of a certain class would issue (Sec. 241.31 of 46 C.R.F., 1941) entitling the vessel to priority use of facilities in the United States, its Territories or possessions, including the Philippine Islands and the Panama Canal Zone.

On January 13, 1942 the United States Maritime Commission issued General Order 49 (Gen. Order 3, W.S.A.) which provided for "Uniform Conditions which Applicant may Incorporate into the Undertaking by reference on Schedule 'A'". This order contained regulations regarding routes, conditions of operation, priorities of materials transported, charter rates and other charges. On December 15, 1943 the War Shipping Administration issued General Order No. 39, 8 F.R. 16919, which permitted shipowners to appeal the charter rates fixed by schedules to the War Shipping Administrator who could fix rates in individual cases in excess of the prescribed rates.

The Renegotiation Act of 1942, T. 50 U.S.C.A.Appendix, § 1191, provided for a system of renegotiation and adjustment on all contracts made with the government to eliminate excessive profits during the war. Shipping contracts were subject to that Act.

Among the controls which became applicable to the shipping industry by reason of the Presidential proclamation were those embodied in the Merchant Marine Act of 1936, 46 U.S.C.A, § 1101 et seq., which provided in § 1242, subdiv. (a) that:—

"during any national emergency declared by proclamation of the President, it shall be lawful for the Commission to requisition or purchase any vessel or other watercraft owned by citizens of the United States, or under construction within the United States, or for any period during such emergency, to requisition or charter the use of any such property. * * *"

The principle of "just compensation" was reiterated in subdivision (c), added to § 1242 by the amendment of August 7, 1939.

Concerning the effect to be given to the government's regulations and controls the Commissioner, in the case at bar, found:—

"Restraints on earnings were imposed through control of the Government time charter and other shipping rates. * * * Libelant earnestly urges that the so-called controls exercised by the Maritime Commission and the War Shipping Administrator of charter rates and insurance valuations should be disregarded in determining just compensation. * * * This however is no forum in which to decide the legality of the regulations adopted by our Government in war time to prevent an unconscionable possible misuse of the Government's crying necessities. These controls cannot be disregarded. They have a

proper bearing upon the issues here under the authorities."

\* \* \* \* \* \*

"On the other hand, it should not be forgotten that the issue is one of just compensation which must be awarded the Libelant for the value of its vessel and these controls furnish at most only one aspect under which that value is to be determined. \* \* \*

"The regulations and controls are an element to be considered in reaching a determination of just compensation. They are, however, but one element and not the sole element thus to be considered."

The Commissioner gave due consideration to Rules 1, 3 and 4 of the Advisory Board on Just Compensation, which he quotes.[3] His report shows that "enhancement" due to a general rise in prices or earnings was not deducted from the value at the time of taking, but that any enhancement due to the Government's need was deducted. The Commissioner's report discusses the governmental restraints and controls on the sale, use and earnings of vessels, which have been outlined herein. He cites the opinions of the Court of Appeals, Second Circuit, in The Petar, 165 F.2d 738 and The Hisko, 2 Cir., 54 F.2d 540.

In The Hisko, 2 Cir., 1931, 54 F.2d 540, 541 the Court recognized the validity of considering the effect of war-time restrictions on value and stated:—

"\* \* \* the respondent's expert, testified that, if the Almirante could have been sold free of all restrictions, she would have brought '$2,000,000, and more.' Witnesses for the libelant gave similar testimony; the average of all such estimates being more than $1,880,000. Of course she could not have been sold free of restrictions, and such testimony does not prove her market value subject to the restrictions she was under; \* \* \*."

In The Petar, 2 Cir., 1948, 165 F.2d 738 the court indicated that it was proper to give consideration to governmental restrictions and controls in determining the value of a vessel. At pages 740 and 741 of 165 F.2d the court stated:—

"She had been requisitioned by the Yugoslavian Government and could not be sold, transferred, or used in any other service

---

**3.** Rule 1.—Just compensation for vessels requisitioned for title or for use is to be determined on the basis of value as of the date of taking, subject to deduction on account of enhancement, if any, as hereinafter set out in Rule 4, and with allowance for any loss on account of delay in payment from the date of taking, not exceeding the current commercial rate of interest. Value means value on the American market, not on foreign markets.

Rule 3.—Where market value cannot be determined by sufficient sales, or hirings of vessels of like character, made at or about the time of taking, it is to be determined by the Administrator from a consideration of cost of construction, acquisition cost so far as relevant, improvements, replacement costs, depreciation, earnings, physical condition, appraisals for insurance or other purposes, and any other relevant facts upon which a reasonable judgment as to value can be based. These various matters are to be given such weight by the Administrator, as in his opinion they are justly entitled to, in determining the price that would probably result from fair negotiations between an owner willing to sell and a purchaser desiring to buy.

Rule 4.—From the value at the time of taking, there should be deducted any enhancement due, to the Government's need of vessels which has necessitated the taking, to the previous taking of vessels of similar type, or to a prospective taking, reasonably probable, whether such need, taking, or prospect, occurred before or after the declaration of the national emergency of May 27, 1941. Enhancement due to a general rise in prices or earnings, whenever occurring, should not be deducted. In the application of this rule neither the proclamation of limited emergency of September 8, 1939, nor the facts existing at that time, are in themselves of significance. The Board does not determine whether any enhancement after May 27, 1941, other than as enumerated above as deductible, should be excluded; since the Board is advised that the value of ocean-going vessels was higher on May 27, 1941, than at the time of taking, and that any enhancement since May 27, 1941, in vessels of other types, not deductible under the foregoing, is attributable to a general rise in prices or earnings, and should therefore not be deducted.

without the consent of both Yugoslavia and Great Britain. In addition in order to obtain whatever ship warrants would be needed in ports of the United Nations, she had to comply with certain conditions imposed as to charter hire and rates of pay. * * *

"The commissioner's report shows that he considered * * * availability for use in view of the restrictions upon her when sunk. * * * He considered * * * the various relevant market factors, such as the extent of demand compared to supply, the restrictions to which ships were subject * * *."

Cases relating to other classes of property requisitioned or condemned by the government during wartime sustain the proposition that government regulations and controls should not be ignored in determining what is "just compensation". In Graves v. United States, D.C., W.D.N.Y. 1945, 62 F.Supp. 231, 233, the court held that it could not ignore wartime governmental restrictions in evaluating bronze castings which were requisitioned by the government. The loss suffered by the owner "because of the restricted market was the result, not of the taking, but of lawful governmental action in imposing restrictions as to use".

In Illinois Pure Aluminum Co. v. United States, 1946, 67 F.Supp. 955, 956, 107 Ct. Cl. 1, involving a stock of fabricated aluminum, the Court considered the effect of wartime regulations and held that:—

"Any just valuation must take into consideration these conditions. Otherwise the owners whose stocks were requisitioned would be put into a preferred classification over concerns whose stocks were not taken, but the disposition of which was necessarily limited by essential wartime restrictions."

In United States v. Delano Park Homes, Inc., 2 Cir., 1944, 146 F.2d 473 land adjacent to a government airfield was condemned by the United States in order to expand the airfield and its facilities. At the time of condemnation a system of priorities for building material was in effect and no priorities had been granted to the owners and developers of the condemned land. The Court of Appeals for the Second Circuit, in an opinion by L. Hand, C. J., held 146 F. 2d at page 474:—

"We cannot agree that the judge should have refused to consider the effect of 'priorities.' Nobody suggests that an owner whose land is not condemned, has any claim upon the United States because he cannot employ it profitably until the system ends. Yet to appraise the land without any deduction for a period during which it will bring in no income, is to reimburse the owner pro tanto; a discount measured by computing the losses, de die in diem, is necessary to avoid putting into a preferred class owners whose lands happen to be condemned, as against those who must bear the deprivation without relief. Otherwise condemnation will prove a bonanza. The defendants have been unable to discover a shred of authority to bear out their pretension, except Judge Mayer's decision in National City Bank v. United States, D. C., 275 F. 855, and Judge Peck's in C. G. Blake Co. v. United States, D.C., 275 F. 861. Both of these do seem to do so; and we affirmed the first in, 2 Cir., 281 F. 754, and the Sixth Circuit affirmed the second in 279 F. 71. However, we regarded ourselves as bound by the findings of the trial judge, and did not pass upon the merits. The per curiam opinion of the Sixth Circuit leaves us a little uncertain how far they accepted this part of Judge Peck's reasoning. In each case the district court had assimilated the situation to that of a case where the market is upset by temporary variations of supply or demand, and where it is indeed true that the immediate prices are not the proper measure of value. Certainly, when an owner can hold his property until the market recovers, it is unjust to allow him only current prices, for presumably he will wait for a recovery before disposing of his goods. Whether the same reasoning applies when he cannot wait, is another question; not decided, so far as we know. However that may be, when competent authority has fixed prices at a maximum, or has denied owners some specific use of their property, it is patently a disregard of its authority, either indirectly to allow a higher price on con-

demnation, or to allow the price to be figured in disregard of the limitation imposed. We overrule National City Bank v. United States, D.C., 275 F. 855, supra, and we must respectfully decline to follow C. G. Blake Co. v. United States, D.C., 275 F. 861, supra, and, if the affirmance should be taken as covering the point now before us, we must also decline to follow that as well."

If the question of value were an issue between individual buyers and sellers in a private sale. these same factors would have. affected the price which a buyer would be willing to pay for the property. The fact that the government is the purchaser does not bar the application of the above principle. In fact it introduces an additional principle—that the owner shall not profit by the fact that his property is requisitioned by the government rather than privately purchased. In United States v. Buxton Lines, Inc., 4 Cir., 1948, 165 F.2d 993, 996, a case involving the requisitioned use of a vessel for four months, the Court, by Soper, C.J., said:—

"These decisions illustrate the important principle of the law of just compensation that the owner should not' profit from the circumstance that his property has been condemned rather than purchased, and that in ascertaining the amount of the award, reference should be made to the same considerations which would have moved the parties had the property been sold in the open market. In short, the pending case should be decided in accordance with the established rule that just compensation is the sum which would probably be arrived at as the result of fair negotiations between an owner willing to sell and a purchaser willing to buy after due consideration of all the elements affecting market value. Olson v. United States, 292 U.S. 246, 257, 54 S.Ct. 704, 78 L.Ed. 1236. The purchaser willing to buy may be merely a hypothetical figure, but as long as his absence is not attributable to the fact that the property has no value, his existence is necessarily assumed. Westchester County Park Commission v. United States, 2 Cir., 143 F.2d 688, 692. There was no private market in the pending case but the ship was navigable and adapted to the carriage of cargo in inland waters and there was at least the demand created by the desire of the United States for her temporary possession and use. The rule is that if there is no private market for the property condemned, resort must be to other data to ascertain the value even though the inquiry may involve what is 'at best, a guess by informed persons.' United States v. Miller, 317 U.S. 369, 375, 63 S.Ct. 276, 280, 87 L.Ed. 336, 147 A.L.R. 55. For example, in Graves v. United States, D.C.W.D.N. Y., 62 F.Supp. 231, where the market for a manufactured article composed of an alloy of metal was impaired or destroyed by governmental wartime restrictions, the court declined to allow the recovery of the ordinary sales price of the articles and fixed the compensation in accordance with the prices paid by the Government for copper under the Copper Recovery Program."

The case of United States v. John J. Felin & Co., 334 U.S. 624, 68 S.Ct. 1238, 92 L.Ed. 1614 relied upon by libelant was held to be "not in point" by the First Circuit in the Eastern Steamship Lines case, supra [171 F.2d 593], involving the valuation of a vessel.

Respondent's exceptions (6) and (7) and libelant's exception (8) are accordingly overruled. Further, the record shows that the restraints and controls actually reduced the charter hire rates and eliminated markets which were open before the imposition of governmental restraints and controls, all of which affected the earnings of the Alaskan and of other vessels subject thereto. That was sufficient. Libelant's exception number (9) is overruled.

The libelants filed certain exceptions which relate to the manner in which the War Shipping Administration is alleged to have used the wartime regulations and controls for the purpose of driving down the value of vessels before requisitioning them. Exceptions (10), (11) and (12) raise this issue as follows:—

"10. In that the Commissioner failed to find the fact admitted by the War Shipping Administrator and established by the proofs that the so-called 'controls' were im-

posed in part by the United States Maritime Commission and War Shipping Administrator for the deliberate purpose of reducing the value of vessels, with a view to reducing the compensation to be paid by said agencies for such vessels when they were later requisitioned."

"11. In that the Commissioner failed to find that the United States is prohibited by the Fifth Amendment of the Constitution from obtaining the benefit of any decrease in the value of the Alaskan because of the so-called 'controls' exercised by the United States Maritime Commission or War Shipping Administrator."

"12. In that the Commissioner held that this Court is 'no forum in which to decide the legality of the regulations adopted by our government' to control vessel earnings and values."

In support of its contention that the regulations and controls adopted by the War Shipping Administration and the United States Maritime Commission were deliberately exercised for the purpose of later acquiring vessels at depressed values, the libelant quotes the following from a prepared statement made by Rear Admiral Land, Administrator of the War Shipping Administration and Chairman of the Maritime Commission, before the Committee on the Merchant Marine and Fisheries, of the House of Representatives, on June 10, 1943 (Page 8 of Ex. 41):—

"However, even if the Maritime Commission had the power to requisition before May of 1941, the exercise of that power during the high market conditions of late 1940 and early 1941 would have been most unwise and unfortunate, since the owners would then have been in a position to file suit in the Court of Claims for the full market values of that peak period. The results of such premature requisitioning would therefore have been very costly to the United States. The only sound strategy was to delay the date of requisitioning as we did until rates and values could be reduced to more moderate levels."

The libelant also quotes certain excerpts from letters of Admiral Land to members of Congress, dated October 15, 1942, and March 22, 1943, printed at pages 2365, 2372

and 2353 of the Congressional Record of March 23, 1943:—

"The question of requisitioning the privately owned merchant marine was the subject of considerable discussion by the Commission during the summer, and fall of 1941. The Commission had determined as a matter of policy that it was not yet prepared to adopt this procedure. Until general control of freight and charter rates had fully taken effect, it was considered possible that the just compensation which an owner might receive under section 902 would of necessity reflect the more lucrative employment available to American flag vessels under then existing conditions."

\* \* \* \* \* \*

"The Commission wanted to avoid, or at least to postpone, the application of section 902 until there had been a further opportunity to effect a reduction of ship earnings and values. The Commission was intent upon effecting a downward revision of the whole structure of rates and values before resorting to requisition."

\* \* \* \* \* \*

"The policy of the organizations [WSA and MC] has been to reduce such values to the lowest level consistent with sound administration practice \* \* \*. The program contemplated a series of reductions, strategically effected, so as to avoid judicial defeat and other mistakes of the first war."

From the above quoted statements the libelant concludes that ship values were deliberately depressed through government regulations for the purpose of requisitioning vessels at depressed values.

However, an examination of the complete Statement of Admiralty Land before the House of Representatives Committee (Ex. 41) reveals the following:—

At page 8:—"Under the circumstances, the Maritime Commission determined not to resort to requisition, even after May 27, 1941, but to continue operations under private ownership until such time as its efforts to reduce and stabilize rates and values should produce results or the need for requisitioning should become clearer and more pressing.

"In April 1942 the War Shipping Administration ordered the requisition for use of practically the entire ocean-going merchant fleet of the United States."

\* \* \* \* \* \*

At page 13:—"The War Shipping Administration does not have dictatorial powers to fix values by edict. It has been our policy to fix rates and values at the lowest reasonable levels. By this is meant the lowest levels consistent with equity which can be sustained in the event of judicial attack. Any attempt to fix rates and values at levels which will force all shipowners into the courts can be justified only if there is reasonable probability that the courts would sustain such reduced rates and values. Forcing the valuations into court in the absence of such reasonable probability would merely result in the payment of higher rates and values plus interest during the interval. Wise administrative action, therefore, calls for fixing rates and values at the lowest reasonable levels that can be sustained in the courts. A drastic effort to return rates and values to 1939 levels would, we believe, throw the whole matter into court and might lead to very much higher valuations and rates than those that have been established by the War Shipping Administration."

In Admiral Land's letter of March 22, 1943, addressed to the Chairman of the House of Representatives Sub-Committee on the Merchant Marine, he stated:—

"The Maritime Commission had no legal control over charter rates (except the powers of sections 9 and 37 of the Shipping Act of 1916, which were of limited application) until after the adoption of the Ship Warrants Act, which was approved on July 14, 1941. In the course of the hearings on that legislation prior to its passage, the Commission pointed out that ship earnings were very high and in danger of getting out of hand."

\* \* \* \* \* \*

"The Commission had begun its efforts toward reduction of values and rates only a few weeks before the date shown on the chart as the peak of time charter rates, which occurred just about the time the President's proclamation of unlimited national emergency (May 27, 1941) made the powers of section 902 operative. The chart therefore indicates graphically the reason for the Commission's desire to avoid, or at least to postpone, the use of its powers to requisition vessels."

The record of Hearings (Ex. 41) before the Committee on the Merchant Marine, House of Representatives on H.R. 2731 also contain the following statements by an attorney representing a large steamship company:—

At page 51:—"With respect to all these ships that are requisitioned, we had a most favorable development which should not be overlooked. From the very beginning the Maritime Commission and the War Shipping Administration took the attitude that the thing to do was to agree on the rates and values, not let these matters go to court. The War Shipping Administration associated with itself a good many very competent men who had had long experience in shipping, men who knew what shipping law was, too, and over a long period of time, after very full inquiry into all the relevant facts, long argument of a most pleasant and informative nature, no ill feeling in any of the arguments, figures were arrived at, and they were based on facts furnished very willingly by the various steamship companies as to what ships had been earning, what they had been sold for, what they were insured for, what the demands for their service were, and many, many details, some of which were bound to be irrelevant but many of which were surely informing, in the effort to arrive at correct figures.

"About a year ago now it was that that agreement was reached after a period of many months of consideration of facts and of honest arm's length negotiation."

■ The charter rates, fixed pursuant to the Ship Warrants Act and by negotiation between the War Shipping Administration and the majority of the shipping industry were intended to control earnings and profits. The statements of Admiral Land set forth above indicate that the primary purpose of the controls was to keep ship earnings within reasonable bounds, to roll them back as other prices were roll-

ed back. It was recognized that this would reduce values. Meanwhile the government's requisitioning program was quite properly held in abeyance. The War Shipping Administration did not impose the regulations under the Ship Warrants Act solely for the purpose of requisitioning vessels at a reduced value. The reduction in value naturally resulted from the control of earnings and profits, but many charters were made under the Regulations during the period of August 1941 to May 1942, before all ocean-going vessels were requisitioned. If the War Shipping Administration had not waited but instead had entered into charters at rates greatly enhanced by the Government's necessities, the War Shipping Administration might have been criticized as wasteful and incompetent. The need for the regulations and a roll back of charter rates is shown by an increase of $50.00 a ton in prices per deadweight ton for large vessels about twenty years of age, between the second and fourth quarters of 1941. Vessels of 6,000 to 8,000 tons increased as much as $33.00 a ton in the first three months of 1941. The Ship Warrants Act was passed in July, 1941. In August, 1941 Regulations under the Ship Warrants Act were put into effect; but it was not until January 1942 that the more stringent requirements for charter applications became effective.

The first promulgation of charter rates by the United States Maritime Commission was contained in Press Release 970 issued July 30, 1941. It provided that the maximum charter rates for vessels on and after August 1, 1941 would be $4.50 per deadweight ton per month on Summer Freeboard up to twelve knots on vessels of 10,000 deadweight ton and up. (Ex. J).

On January 13, 1942 the United States Maritime Commission published a document entitled "Uniform Conditions which Applicant may Incorporate into the Undertaking by reference on Schedule A". In paragraph 2 thereof it states:—

"That until the Commission or other public rate regulatory authority, with jurisdiction and power in the premises shall otherwise prescribe, applicant agrees (1) to make

no time charter at rates higher than those, appropriate to the type of vessel used, stated by the Commission in its release of January 5, 1942 (hereafter to be incorporated into and referred to as General Order No. 49, and now known as PR 1117 * * *) * * *." (Ex. K).

General Order No. 49, referred to in Exhibit K is dated December 30, 1941 and provides that effective January 20, 1942 the maximum time charter rates for general cargo vessels and tankers would be, for vessels 10,000 deadweight ton and up, $3.25 per deadweight ton per month on Summer Freeboard on ten knots.

On February 7, 1942 the President issued Executive Order No. 9054, 50 U.S.C.A.Appendix, § 1295 note, which created the War Shipping Administration which took over many duties of the United States Maritime Commission. General Order No. 3, dated February 10, 1942, issued by the War Shipping Administration, confirmed the rates set up by the United States Maritime Commission's General Order No. 49.

Subsequently on May 14, 1942 the War Shipping Administration issued General Order No. 8 and provided a basic rate of $3.75 for cargo vessels of 10,000 deadweight ton and up, on sailings prior to May 1942, and of $4.00 on sailings subsequent to May 16, 1942. (Ex. 40).

On June 12, 1942 the Time Charter of the S.S. Alaskan between the Owners and the Government provided for a basic rate of $4.00 per deadweight ton. (Ex. 15).

The attack on Pearl Harbor took place December 7, 1941. General Order No. 49 of the United States Maritime Commission issued December 30, 1941 became effective January 20, 1942. The Emergency Price Control Act, 50 U.S.C.A.Appendix, § 901 et seq., was enacted January 30, 1942.

The Ship Warrants Act and the Regulations issued thereunder were not directed against the libelant's vessel alone or against any particular vessel. The Alaskan was not singled out for requisitioning to the exclusion of other vessels. The Ship Warrants Act and the Regulations issued thereunder were part of an anti-inflation program and were also designed to speed the

transportation of essential war materials. They affected values as a matter of course, just as similar controls affected values in other fields.

■ The government has the power in a national emergency to control earnings, whether they are the wages of workmen or the earnings of business. The charter rates fixed by the War Shipping Administration were similar to the rent controls established by the Office of Price Administration. Their effect in reducing the value of property did not make them unconstitutional under the Fifth Amendment, as explained by the Supreme Court in Bowles v. Williamham, 321 U.S. 503, at page 517, 64 S. Ct. 641, at page 648, 88 L.Ed. 892:—

"Of course, price control, the same as other forms of regulation, may reduce the value of the property regulated. But, as we have pointed out in the Hope Natural Gas Co. case (Federal Power Commission v. Hope Natural Gas Co.), 320 U.S. [591], page 601, 64 S.Ct. 281 [88 L.Ed. 333], that does not mean that the regulation is unconstitutional. Mr. Justice Holmes, speaking for the Court, stated in Block v. Hirsh, supra, 256 U.S. [135], page 155, 41 S.Ct. [458], page 459, 65 L.Ed. 865, 16 A.L.R. 165: 'The fact that tangible property is also visible tends to give a rigidity to our conception of our rights in it that we do not attach to others less concretely clothed. But the notion that the former are exempt from the legislative modification required from time to time in civilized life is contradicted not only by the doctrine of eminent domain, under which what is taken is paid for, but by that of the police power in its proper sense, under which property rights may be cut down, and to that extent taken, without pay.' A member of the class which is regulated may suffer economic losses not shared by others. His property may lose utility and depreciate in value as a consequence of regulation. But that has never been a barrier to the exercise of the police power. L'Hote v. New Orleans, 177 U.S. 587, 598, 20 S.Ct. 788, 792, 44 L.Ed. 899; Welch v. Swasey, 214 U.S. 91, 29 S.Ct. 567, 53 L.Ed. 923; Hebe Co. v. Shaw, 248 U.S. 297, 39 S.Ct. 125, 63 L.Ed. 255; Pierce Oil Corp. v. City of Hope, 248 U.S. 498, 39 S.Ct. 172, 63 L.Ed. 381; Hamilton v. Kentucky Distilleries Co., 251 U.S. 146, 157, 40 S.Ct. 106, 108, 64 L.Ed. 194; Euclid v. Ambler Realty Co., 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303, 54 A.L.R. 1016; West Coast Hotel Co. v. Parrish, 300 U.S. 379, 57 S.Ct. 578, 81 L.Ed. 703, 108 A.L.R. 1330. And the restraints imposed on the national government in this regard by the Fifth Amendment are no greater than those imposed on the States by the Fourteenth. Hamilton v. Kentucky Distilleries Co., supra; United States v. Darby, 312 U.S. 100, 657, 61 S.Ct. 451, 85 L.Ed. 609, 132 A.L.R. 1430."

■ No constitutional right of the libelant was violated by the Congressional enactments or by the manner in which the Maritime Commission and the War Shipping Administration regulated shipping, applying thereto regulations and controls authorized by the statutes. The power to requisition vessels was also entrusted by the Congress to the War Shipping Administration, on condition that "just compensation" be paid. When to requisition, rested in the sound discretion of the War Shipping Administration.

Libelant's exceptions (10), (11) and (12) are accordingly overruled.

Libelant's exceptions (1) to (5) inclusive relate to libelant's contention that the Commissioner erred when he fixed a value of $983,250 instead of the $1,350,000 claimed by the libelant. That contention is stated generally in exception (1). Exception (2) assumes that the Alaskan had a "market value" at the time of her requisition and at the time of her loss, and that the vessel's market value was $1,350,000 as "shown by sales of other vessels during 1941 and 1942". Exception (3) in effect asserts that the Commissioner was in error when he held that the year "1941 was the only market for vessel sales which can properly be considered" in this case; and exception (4) charges error in that the Commissioner found that "there were no sales in 1942 on which the value of the Alaskan could be properly based". Exception (5) asserts that a $1,350,000 value for the Alaskan "was shown by her earning power, replacement cost and other

relevant facts". Exception (9) also relates to the Alaskan's earnings power and states that there is "no substantial proof in the record of the amount, if any, of actual reduction in earning power and value of the Alaskan claimed by respondent to have resulted from the so called 'controls' over shipping * * *".

The Commissioner's report shows that his conclusions as to the presence or absence of a market for vessels such as the Alaskan were based on a careful analysis of the evidence before him. I quote from his report as follows:—

"We are, of course, here considering ship value in war time, both before and during our country's participation in this war. In the latter part of 1939 the American shipping industry had been suffering from a great overtonnage situation, a surplus world-wide in scope, which had a particularly depressing effect on domestic market values. This was accompanied by a long and expensive shipping strike during the year. In 1940 shipping conditions improved largely resulting from the European War, and this improvement continued throughout the year. In 1940 the market value of dry cargo ships in the domestic market reached $50 per ton or more. Libelant itself, in June and July of that year, sold two vessels of the same deadweight tonnage as the Alaskan which were built in 1922 for substantially $83.00 per deadweight ton.

"1941 was a prosperous year for American ships in the world trade. As Admiral Land says, in his statement to the House Committee: 'From December, 1940 to July, 1941, there was a marked rise in charter rates and ship values. * * * Shipping space was hard to get. Waterborne transportation was at a premium.' The economic facts bearing upon the fluctuations in war demand for ocean transportation were recognized by Admiral Land in his letter of March 22, 1943, to the Chairman of the Senate Committee on Commerce, where he says: 'It is true that 1941 was a prosperous year for most steamship companies. This prosperity was not based on monies received from the United States Government, for we were then at peace,

and had not requisitioned the merchant fleet, but rather on the great improvement in the steamship business in that year which was worldwide in scope. The history of the steamship business shows that these peaks occur once in ten or twenty years.' According to a Government chart in this year sales of large vessels about twenty years of age rose from about $75 per dead weight ton in the first quarter of 1941 to about $87 in the second quarter, to about $108 in the third quarter, and to about $138 in the fourth quarter. 1941 was the last year in which American shipping was for the most part substantially free of interference by Government action. The only two exceptions to that general freedom were as follows: (1) Pursuant to long existing powers the Maritime Commission in that year closed foreign markets to United States flag vessels by declining to give its approval required under Sections 9 and 37 of the Shipping Act of 1916, as amended. In the two prior years, 1939 and 1940, such sales of American vessels to alien buyers had been freely permitted and more than 100 such vessels thus sold. After October, 1940, however, only four sales of large vessels from private owners to aliens were allowed in 1941, and three were allowed in March, 1942. (2) The other factor of Government action was the passage of the Ship Warrants Act on July 14, 1941, regulations concerning which were adopted in August of that year. The Act was not, however, in substantial operation during 1941. In that year there were numerous sales of cargo vessels in the same general class of the Alaskan and of about its age. These will be considered later. In 1942, when our country was beginning to participate in the World War, more vessels were being sunk than were being built, the Ship Warrants Act was in effect, sales of existing American flag vessels between private operators were precluded and a general requisition of American ships to war purposes of the nation was made effective in April, 1942. The Alaskan was one of the vessels so requisitioned. Certain features of the Warrants Act against which Libelant complains will be considered in another connection. The meager number of sales permitted during 1942, and the prices

of such sales cannot be considered as making a market value in that year properly applicable to the Alaskan."

■ The Commissioner's report discusses in quite some detail the non-government sales in 1941 of ocean going dry cargo vessels of the general size, type and age of the Alaskan. The Commissioner concluded: "There were sufficient sales in 1941 to constitute a market on which value might be appraised". His report states:—

"1941 is the only market for sales which can properly be considered here. It is the nearest market to the requisitioning of the Alaskan; in 1942 there was no market owing to Government regulations substantially eliminating it so far as transactions between private owners is concerned. While it is true that the record indicates some sales in 1942 they were meager in number and the high prices indicated by these sales should have no proper bearing upon the value to be ascribed to the Alaskan for reasons previously set forth."

Libelant's exceptions (2), (3) and (4) are overruled.

■ The Commissioner considered the earning power of the Alaskan. His report specifically mentions the fact that in 1942 the Alaskan was earning "even under Government requisition charter, at a rate equal to about $227,000 annually". The report also states that among the relevant matters considered by the Commissioner in fixing a value for the Alaskan were "its earnings and physical condition both before and after requisition". Referring to governmental restraints during the Second World War, the Commissioner stated: "Restraint on earnings were imposed through control of the Government time charter and other shipping rates". The Commissioner's report does not discuss in detail the testimony as to earning power but he considered it.

Libelant's main brief states: "Under the prevailing economic conditions there can be no doubt that the Alaskan could have continued to earn at the rate shown in Exhibit 30 or more for the duration of the war and some time thereafter if the libelant had been free to employ her commercially". The restraints and controls and the requisitioning prevented libelant from employing the Alaskan commercially at anything like the figures shown on Exhibit 30 which the brief also states "establishes that the Alaskan was actually capable of earning at the rate of $5.70 per deadweight ton per month or $68.40 per annum before taxes and book depreciation".[4] As far back as July 30, 1941 the War Shipping Administration had fixed time charter rates at $4.50 per deadweight ton for a vessel of the size of the Alaskan and thereafter the fixed rates were reduced so that at the time the Alaskan was requisitioned her charter rate was fixed at $4.00 per deadweight ton per month. (Ex. 15).

The testimony of libelant's expert, Burnell, is based on the potential earnings of the Alaskan as shown by Exhibits 29 to 32 inclusive, and on his assumption that it was reasonable to expect a continuation of reasonably high earnings for a period of at least four years. And he assumed also "a perfectly free market", which did not exist. Using all those assumptions Mr. Burnell expressed the opinion that the Alaskan would bring a price of $130 per deadweight ton, or a total of $1,345,500 in "fair negotiations between a willing seller and a willing buyer, both in June and November 1942". The witness Burnell had no experience in valuing vessels. The exhibits he used were all based on earnings in trades and at rates that were barred by government controls. Further, the actual earnings of the Alaskan as fixed by her time charter under which she was operating were $4.00 per deadweight ton, not $5.70. They were 30% less than the earnings rate assumed by the witness Burnell. If his valuation of $1,350,000 is reduced by 30% the result is $945,000. The Commissioner allowed $983,250.

The assumption that the Alaskan would be operating for four years at the rates mentioned on the charts (Exs. 29 to 32) or at the rate mentioned in the time charter (Ex. 15) was subject to the risk of loss

---

4. This included an exceptional return on Red Sea charters, made under "emergency conditions" and "never repeated". Admiral Land's deposition.

by enemy action. As a matter of fact the Alaskan operated under the time charter for only five and a half months after her requisitioning, when she was torpedoed on November 28, 1942.

Libelant's exception (9) is overruled.

The replacement cost of the Alaskan and the "depreciation" rate to be applied thereto are discussed at some length in the Commissioner's report. As observed by Judge Chase in his opinion in the Petar case, supra, the percentage of "depreciation" progressively applied to the "reconstruction cost" should perhaps be called an "age differential percentage." [165 F.2d 741]. The Commissioner's report analyzes the testimony of the "five witnesses called, three by the libelant and two by the respondent, each of whom testified as an expert on the reproduction cost of the Alaskan". Concerning the rates of depreciation used by the experts the Commissioner stated: "Careful study of the expert testimony compels the conclusion that neither the 2½% rule nor the 5% rule should be applied, the net result of which is to confirm the conclusion of the Circuit Court in the Petar case that the laying down of a definite formula of fixed application is impossible and there are variables which prevent the application of any rule of thumb".

Libelant's exception (5) and respondent's exception (5) are overruled.

The Commissioner's finding that the Alaskan had a value of $983,250 was correct. It might be noted that the amount specified by the War Shipping Administration as the War Risk Insurance valuation under Option 1 of the requisition time charter was $879,750. The government tendered $776,003 with interest to be computed from January 29, 1943, to November 13, 1944 at ⅞ of 1% per annum. The amount claimed by the libelant as just compensation in paragraph Twelfth of the libel filed November 27, 1944 was $1,035,000. The Commissioner's figure of $983,250 is about half way between the valuation of $1,250,000 as of the date of requisition testified to by libelant's witness Haight, and the $716,000 residual value of the Alaskan in 1942 testified to by respondent's witness Sturm. Mr. Haight used a depreciation rate of 2½% on a reconstruction cost of $2,700,000 testified to by libelant's witness Pennypacker, whose estimate of the cost of reproduction seems to have been accepted by the Commissioner. Mr. Sturm testified to a replacement cost of the Alaskan in 1942 of $2,452,000, to which he applied a depreciation rate of 5%. The Commissioner concluded that "Neither the 2½% rule nor the 5% rule should be applied". The Alaskan was completed in November 1918. She was about twenty-four years old when she was sunk. The Commissioner's valuation of $983,250 would represent an annual progressive depreciation rate of about 3.7% applied to a reconstruction cost of $2,700,000. The Court of Appeals for the Second Circuit held in the Petar case that because a 2½% rate of depreciation was approved by the Supreme Court in the Standard Oil case, (Standard Oil Co. of New Jersey v. Southern Pac. Co.), 268 U.S. 146, 45 S.Ct. 465, 69 L.Ed. 890, arising out of a collision in World War I, and was used by the Second Circuit in the Hisko case, also a World War I case, it did not follow "that the correct depreciation rate, a variable factor, is necessarily 2½% for ships lost during both wars."

The Commissioner properly did not base his valuation solely on reconstruction cost less an age differential. He first reached a conclusion as to value based upon 1941 sales of comparable vessels and the testimony on general ship sales values in that year to the extent that they indicated a rising market during that year. He gave due regard to the testimony concerning the effect of government restrictions in effect in the Fall of 1941, and supplemented in 1942. He then checked that conclusion "tentatively reached" with the facts as to the character and appointment of the Alaskan, her age, cost, improvements, earnings and physical condition, and "the testimony of experts on its reproduction cost less depreciation" and all other facts relating to value not specifically enumerated but in the record.

The Commissioner's report shows that he considered the value of vessels in 1941. He discusses these values and shows how

the market was rising, so rapidly in fact that the War Shipping Administration's regulations of January 1942 in relation to applications for charter parties became inevitable if our national economy was to be preserved during a war that had in fact begun on December 7, 1941, and did not end until August 1945.

Libelant's argument before the Commissioner was that the need for vessels was such in 1942 that the Alaskan should be given a value of $1,350,000, disregarding the so-called controls. But they cannot be disregarded as has been shown above. If they had the effect of reducing values only about 27%, the $1,350,000 claimed by the libelant would be reduced to the value fixed by the Commissioner. In the oral argument on the exceptions to the Commissioner's report counsel for libelant in effect conceded that if the regulations and controls of the War Shipping Administration were validly imposed he had no quarrel with the Commissioner's valuation.

Libelant's exception (1) and respondent's exception (1) are overruled.

"It is not apparent that error entered into the tentative way all the various factors were used by the commissioner as an approach to the ultimate finding of value." Judge Chase in The Petar case.

The Commissioner's report is adopted by the Court as correct, with one exception. The last paragraph of the report dates the interest on $401,247 from November 27, 1944; it should be from February 16, 1946. When the libel herein was filed on November 27, 1944, the government had already paid libelant $414,000 (a payment of $207,000 on November 24, 1943 and a further payment of $207,000 on December 2, 1943). This would leave a balance of $569,250 as of November 27, 1944, adopting the Commissioner's valuation of $983,250. On February 16, 1946 the government made a further payment of $168,002.25 which brought the total payments to $582,002.25 and left a balance of $401,247.75 unpaid as of February 16, 1946, on the Commissioner's valuation of $983,250. Interest at 4% should be allowed on $569,250 from November 27, 1944 to February 16, 1946, and on $401,247.75 from February 16, 1946 to the date of judgment.

Libelant is entitled to a judgment against the respondent as follows:—

For the principal sum of $401,247.75;

For interest on $569,250 at the rate of 4% from November 27, 1944 to February 16, 1946;

For interest on $401,247.75 at the rate of 4% from February 16, 1946 to the date the judgment is entered;

And the costs of the action.

The judgment itself will carry interest at 4% until it is paid.

■ The Commissioner devoted 239 hours to the case. The record consists of 1592 pages of testimony and 101 exhibits. His typewritten report covers 40 pages. His fee is fixed at Seven thousand, five hundred Dollars ($7,500).

Settle a decree accordingly.

### Supplemental Opinion.

My opinion in this proceeding was filed on January 21, 1949. At pages 29–30 of the typewritten copy [85 F.Supp. 828], the following appears:—

"The record of Hearings (Ex. 41) before the Committee on the Merchant Marine, House of Representatives on H.R. 2731 also contains the following statements by an attorney representing a large steamship company:—

" 'At page 51:—With respect to all these ships that are requisitioned, we had a most favorable development which should not be overlooked. From the very beginning the Maritime Commission and the War Shipping Administration took the attitude that the thing to do was to agree on the rates and values, not let these matters go to court. The War Shipping Administration associated with itself a good many very competent men who had had long experience in shipping, men who knew what shipping law was, too, and over a long period of time, after very full inquiry into all the relevant facts, long argument of a most pleasant and informative nature, no ill feeling in any of the arguments, figures were arrived at, and they were based on

facts furnished very willingly by the various steamship companies as to what ships had been earning, what they had been sold for, what they were insured for, what the demands for their service were, and many, many details, some of which were bound to be irrelevant but many of which were surely informing, in the effort to arrive at correct figures.

" 'About a year ago now it was that that agreement was reached after a period of many months of consideration of facts and of honest arm's length negotiation.'

"The charter rates, fixed pursuant to the Ship Warrants Act and by negotiation between the War Shipping Administration and the majority of the shipping industry were intended to control earnings and profits."

On January 26, 1949 counsel for the libelant, the American Hawaiian Steamship Company, addressed a letter to me in which he stated:—

"I trust that you will permit me to bring to your attention the fact that, apparently through inadvertence, pages 29–30 of your opinion of January 21st include a quotation taken from a part of Exhibit 41 which was not in evidence and certain comments thereon.

"Presumably this was an inadvertence arising from the reporter's failure to indicate by her marking on the booklet which comprised Exhibit 41, that only pages 2 to 13, both inclusive, were offered and admitted in evidence. Those pages cover the statement of Admiral Land, Administrator, War Shipping Administration.

\* \* \* \* \* \*

"In the light of the foregoing circumstances, it is respectfully requested that your Honor delete from the opinion the last four lines appearing on page 29 and all of page 30 down to the sentence beginning in the eighth line from the end of the page with the words 'The statement of Admiral Land \* \* \*.' "

At the time of the admission of the said exhibit the following appears in the record made before Commissioner Alger:—

"Mr. Smith: If your Honor please, if you are going to take in the statements that are already read, I object to any part of this material going in without an opportunity to examine. However, if you are going to take part of it, I think that the entire statement ought to go in, because it goes on and shows that these conditions did not continue to prevail for long.

"Commissioner Alger: If you prefer to have it that way, I will do that. I will take both documents in.

"(Document heretofore marked Libellant's Exhibit No. 40 for identification received in evidence.)

"(Printed copy of the hearing before the Committee on The Merchant Marine and Fisheries, House of Representatives, Seventy-eighth Congress, was received in evidence marked Libelant's Exhibit No. 41, Witness Morrison.)"

On February 4, 1949, Mr. Edward L. Smith, Special Assistant to the Attorney General, sent me a reply to Mr. Rinehart's letter of January 26, 1949, in which he stated in part as follows:—

"Mr. Rinehart offered so much of the record of the hearing in question as included the statement of Admiral Land and my objections were confined to that offer. The Commissioner, however, ruled that he would take the document by which he may have meant the entire document and thereafter the entire hearing record was marked in evidence without restriction and no objection was made by either Mr. Rinehart or myself to the stenographer's action in this regard."

Under date of February 9, 1949 the attorneys for the parties submitted the following stipulation and certification to the Court:—

"Stipulation Regarding Libelant's Exhibit 41

"It Is Hereby Stipulated that libelant offered and the Commissioner received in evidence as 'Libelant's Exhibit No. 41' in the record of hearings before the Commissioner in the above entitled proceedings, only the 'Statement of Rear Admiral Emory S. Land, Administrator, War Shipping Administration,' appearing at pages 2 to 13, both inclusive, of the booklet entitled 'Hearings before the Committee on the

Merchant Marine and Fisheries, House of Representatives, Seventy-Eighth Congress, First Session, on H.R. 2731', and that no other portions of said booklet were offered or admitted in evidence.

Kirlin, Campbell, Hickox & Keating
By Clement C. Rinehart

Clement C. Rinehart
Proctors for Libelant

John F. X. McGohey, United States Attorney
By Edward L. Smith,

Edward L. Smith,
Special Assistant to the Attorney General
Proctor for Respondent

"The foregoing stipulation is approved and it is hereby certified that in marking the cover of the above described booklet with the legend:

'Libellant's EXHIBIT No. 41
witness: Morrison
Amer-Hawaiian —A–133–397
Sills Reporting Service
JAN 20 1948',

the stenographer omitted to indicate, apparently as a result of oversight or mistake, that the portions of the booklet admitted in evidence consisted only of pages 2 to 13 of the booklet.

George W. Alger
Commissioner"

In Mr. Rinehart's letter of January 26, 1949 he made this observation:—

"As the foregoing material was probably not a decisive factor in your opinion, I would not trouble you on the subject except for the general importance of this case and the possibility that a wrong impression of the facts of the case may be obtained by other courts before whom your opinion may come."

The assumption that the quoted matter of Mr. Hupper's statement taken from Exhibit 41 was not a decisive factor in the decision I reached to approve the Commissioner's Report, is correct.

At no place in the briefs was my attention directed to any limitation on the ruling of the Commissioner in respect to Exhibit 41. The list of exhibits, which is part of the minutes, has this statement in relation to Exhibit 41;—"41 Printed copy of the Hearings before the Committee on the Merchant Marine and Fisheries—House of Representatives—78th Congress—was received 'In Evidence'."

In view of the stipulation of counsel and the certification of the Commissioner, I have concluded that the portion of the opinion of January 21, 1949 to which Mr. Rinehart has raised objection should be stricken.

The libelant's acceptance of charter rates fixed by the Ship Warrants Regulations, as distinguished from requisition rates, was described by Mr. Morrison, a representative of libelant, as follows (pages 1525–1526 of the record):—

"Q. Coming to the voluntary charters, were you under any compulsion to charter your vessels to the Government at the voluntary charter rates promulgated by the War Shipping Administration? A. You mean, the time-charters to the Maritime Commission in the late fall of 1941?

"Q. Yes. A. I don't know how you define the word 'compulsion'. We were faced with this situation. The Government wanted to use those ships in what was essentially a war effort. They carried almost exclusively Lend Lease Cargoes out, and strategic materials home, and we had no option, except to say, 'You can't so use them' or take their rates. Now, that was the decision we were faced with in the Fall of 1941.

"Q. But you did have the option to say 'You can't so use them.' A. Yes, and we didn't want to be put in the position of not letting our government use those ships at that time.

"Q. But it was a voluntary act on your part? A. Yes, legally it may have been, but that is exactly what the situation was."

It seems to be appropriate to include in this memorandum certain facts with respect to the requisition charter rates, which do not appear in my opinion of January 21, 1941, and which tend to show that the $4.00 per deadweight ton was fair.

The Alaskan was requisitioned on May 25, 1942. The time charter for the Alaskan transmitted to the libelant by the War Shipping Administration on July 2, 1942, effective as of June 12, 1942, contained the following clause:—

"Option I. A basic rate of $4.00 per deadweight ton per month computed in accordance with the Charterer's General Order No. 8, together with any appropriate adjustments or premiums in accordance with such general order, which full rate shall be subject to revision not more often than once in every 120 days as in paragraph D below provided; or * * *"

"Paragraph D" provided that after September 1, 1942 either party to the charter of the Alaskan could request a redetermination of the rate of charter hire upon thirty days written notice to the other party. If the rate was not revised the remainder of the charter period would be paid for on the basis of "just compensation" as set forth in Section 902 of the Merchant Marine Act of 1936, 46 U.S.C.A. § 1242.

The second option, Option II in the charter, provided for a rate of hire to be determined in accordance with the provisions of said Section 902.

The libelant selected Option I and chose to accept the charter hire rate of $4.00 per deadweight ton per month rather than the option based upon "just compensation". During the time the charter of the Alaskan was in effect libelant did not exercise its option to request a revision of the rate so set. The charter further provided that "after September 1, 1942 either party may sooner terminate this charter (the vessel to be redelivered as hereinafter provided) upon not less than 30 days' notice." The libelant never exercised this option of cancelling the charter with respect to the Alaskan.

Other vessels of libelant's fleet were also requisitioned under charter. It was not until June or July of 1943, about a year after the Government had requisitioned the vessels, that libelant exercised its option of accepting "just compensation" rather than the charter rate fixed by the Government, in respect to those ships.

It further appears that libelant was given an opportunity to submit its views in writing and also, at a later date, to confer on how the War Shipping Administration should determine requisition rates and values in 1942. Mr. Morrison testified (at page 1529 of the record):—

"A. What you are probably referring to is this: In 1942, after our ships had been requisitioned, we were asked to submit in writing our views on how the War Shipping Administration should determine requisition rates and values, and Mr. Farley did write to Admiral Land in 1942 on that subject, and after, a short time after that there was a meeting in Washington to which we were invited and which Mr. Farley and I attended, where this question of requisition rates was discussed with Mr. Ratner and Mr. Hoolihan, and I know of no discussion between Mr. Farley and Admiral Land about berth rates before that."

As I pointed out in my opinion of January 21st the value of the Alaskan at a $4.00 per deadweight ton charter rate would result in a valuation of about $945,000, if we employ the method used by libelant's witness Burnall. For the reasons set forth in my opinion of January 21st, I am convinced that the value of $983,250 for the Alaskan fixed by the Commissioner herein, is just compensation.